UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA,

                                        Plaintiff,

                        -v.-

HARLEYSVILLE WORCESTER INSURANCE
COMPANY,

                                        Defendant.

22 Civ. 2171 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

    In 2017, an employee of an electrical subcontractor working on a construction project at Rockefeller Plaza filed a personal injury lawsuit to recover for injuries allegedly suffered in a workplace accident.  Now in this separate action, the general contractor's insurer, Travelers Property Casualty Company of America ("Plaintiff") seeks a declaration that the subcontractor's insurer, Harleysville Worcester Insurance Company ("Defendant"), has a duty to defend the contractor, the building owner, and the building's managing agent in the underlying personal injury action; that Defendant's policy is primary and non-contributory; and accordingly, that Plaintiff should be reimbursed for litigation costs incurred to date.  Defendant has filed a cross-motion seeking a declaration that it has no such duty to defend or indemnify; that Plaintiff's policy is not excess; and that Plaintiff is not entitled to reimbursement.  For the reasons set forth in this Opinion, the Court grants Plaintiff's motion in part and denies Defendant's cross-motion in its entirety,

ultimately concluding that Defendant has a duty to defend all three of the

defendants in the underlying action, but that priority of coverage cannot be

determined at this time.

BACKGROUND[1]

**A.    Factual Background**

**1.    The Insurance Policies**

Defendant issued to electrical subcontractor Atlas-Acon Electric Service

Corporation ("Atlas") a Commercial General Liability insurance policy bearing

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in
connection with their cross-motions for summary judgment.  The Court primarily
sources facts from Plaintiff's Local Civil Rule 56.1 Statement of Material Undisputed
Facts ("Pl. 56.1" (Dkt. #20)), Defendant's Response to Plaintiff's Local Rule 56.1
Statement and Statement of Additional Material Facts pursuant to Local Civil Rule
56.1(b) ("Def. 56.1" (Dkt. #26)), and Plaintiff's Response to Defendant's Local Civil Rule
56.1 Statement ("Pl. 56.1 Reply" (Dkt. #29)).  Citations to a party's Rule 56.1 Statement
incorporate by reference the documents and testimony cited therein.  Where a fact
stated in a movant's Rule 56.1 Statement is supported by evidence and controverted
only by a conclusory statement by the opposing party, the Court finds that fact to be
true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of
material facts set forth in the statement required to be served by the moving party will
be deemed to be admitted for purposes of the motion unless specifically controverted by
a correspondingly numbered paragraph in the statement required to be submitted by
the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent
pursuant to Rule 56.1(a) and (b), including each statement controverting any statement
of material fact, must be followed by citation to evidence which would be admissible, set
forth as required by Fed. R. Civ. P. 56(c).").  Where one party agrees fully with a fact set
forth in the other's Rule 56.1 Statement, the Court cites only to the Rule 56.1
Statement of the party originally stating the fact.

The Court sources additional facts from the exhibits to the Stipulation as to
Authenticity signed by counsel for both parties (Dkt. #21), including the insurance
policy issued by Defendant to Atlas-Acon Electric Service Corporation (the "Harleysville
Policy" (*id.*, Ex. 1)) and the insurance policy issued by Plaintiff to J.T. Magen &
Company Inc. (the "Travelers Policy" (*id.*, Ex. 2)); the declaration of Logan A. Carducci
(the "Carducci Decl." (Dkt. #18, Ex. 1)), and the exhibits attached thereto, including the
Purchase Order agreement between Atlas and JT Magen (the "Purchase Order" (*id.*,
Ex. 7)), the construction management agreement between NBCUniversal and JT Magen
(the "Construction Management Agreement" (*id.*, Ex. 6), the summons and complaint in
the Underlying Action (the "Tort Complaint" (*id.*, Ex. 8)), the bill of particulars entered in
the Underlying Action (the "Bill of Particulars" (*id.*, Ex. 9)), and the third-party
complaint against Atlas and Port Morris Tile & Marble Corp. in the Underlying Action

2

policy number MPA00000040522P for the period from November 1, 2014, to November 1, 2015 (the "Harleysville Policy").  (Pl. 56.1 ¶ 1; *see also generally* Harleysville Policy).  An endorsement attached thereto numbered CG 7254 2/10 (the "Harleysville AI Endorsement") contains the following additional insured provision (the "Harleysville AI Provision"):

> A.    Section II – Who Is An Insured is amended to include as an insured any person or organization for whom "you" are performing operations, only as specified under a written contract or agreement that requires such person or organization be added as an additional insured on "your" policy.  Such person or organization is an additional insured only with respect to liability caused, in whole or in part, by the acts or omissions of the "Named Insured", or those acting on behalf of the "Named Insured", in the performance of the "Named Insured's" ongoing operations for the additional insured only as specified under the "written contract."

(Harleysville Policy at 53).

Plaintiff issued to general contractor J.T. Magen & Company Inc. ("JT Magen") a Commercial General Liability insurance policy bearing number VTC2J-CO-828K6622-TIL-14, with a coverage period of September 30, 2014, to September 30, 2015 (the "Travelers Policy").  (Pl. 56.1 ¶ 3; *see also* Travelers

---

(the "Third-Party Complaint" (*id.*, Ex. 10)); and the Declaration of Lorin Donnelly (the "Donnelly Decl." (Dkt. #25)) and the exhibits attached thereto.

For ease of reference, the Court refers to Plaintiff's memorandum of law in support of its motion for partial summary judgment as "Pl. Br." (Dkt. #19); to Defendant's memorandum of law in opposition to Plaintiff's motion and in support of its cross-motion for summary judgment as "Def. Opp." (Dkt. #27); to Plaintiff's memorandum of law in further support of its motion and in opposition to Defendant's cross-motion as "Pl. Reply" (Dkt. #28); and to Defendant's memorandum of law in further support of its cross-motion as "Def. Reply" (Dkt. #30).

Policy at 2).  The Travelers Policy contains an amendment defining an additional insured as:

> 1.      WHO IS AN INSURED – (Section II) is amended to include any person or organization you are required to include as an additional insured on this policy by written contract or written agreement in effect during this policy period and signed and executed by you prior to the loss for which coverage is sought.  The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.  The person or organization is only an additional insured with respect to liability caused by "your work" for the additional insured.

(Travelers Policy at 42).

### 2.      The Construction Project

In January 2014, JT Magen entered into a Construction Management Agreement with NBCUniversal Media, LLC ("NBCUniversal") for a Lobby/Stair Renovation Project at 30 Rockefeller Plaza, New York, New York (the "Project"). (Pl. 56.1 ¶ 7).  The Construction Management Agreement named NBCUniversal as the owner of the Project location (Construction Management Agreement at 3 (Preamble)).  Tishman Speyer Properties, L.P. ("Tishman") was the managing agent for the Project location (*Id.* ¶ 11; *see also* Carlucci Decl., Ex. 16 ¶ 2.1 (Facilities Management Agreement Between NBCUniversal and Tishman)), and the Construction Management Agreement indicated that Tishman's "rules and regulations" would govern the work performed (Construction Management Agreement ¶ 3.3(k)).

In July 2014, JT Magen subcontracted with Atlas to perform electrical work at the Project.  (Pl. 56.1 ¶ 12).[2]  In furtherance of that arrangement, JT Magen and Atlas executed an agreement (the "Purchase Order") dated July 11, 2014.  (*Id.* ¶ 12).  The Purchase Order states, in relevant part, the following regarding Atlas's workplace safety obligations (the "Purchase Order Safety Provision"):

> 5.   [Atlas] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of its Work.  [Atlas] also shall be responsible for reviewing and complying with all safety precautions and requirements set forth in the JTM Safety Manual, OSHA requirements and Building Codes and agrees to the penalties for infraction as set forth therein.

(*Id.* ¶ 13; *see* Purchase Order ¶ 5).  The Purchase Order also places the following insurance obligations upon Atlas:

> 17.   [Atlas] will submit project specific insurance documents including but not limited to specified endorsements … or their equivalent specifically naming [JT Magen], Owner, their officers, directors, agents and employees, Building Owner, Landlord, Managing Agent, Lender and all applicable indemnities, if any, their respective agents, officers, directors, employees and partners (hereinafter collectively 'Indemnitees') as an additional insured afforded on a primary and non-contributory basis under all liability coverages[.]

---

[2]   The filings in this case and in the Underlying Action are inconsistent in their descriptions of the roles held by, and business relationships between and among, Tishman, NBCUniversal, and JT Magen.  For example, the Tort Complaint refers to JT Magen (rather than NBCUniversal) as the lessor, lessee, and owner of the building, and also names Tishman as the lessee and lessor of the building.  (Tort Complaint ¶¶ 6-8, 43-45).  The Court adopts the uncontroverted descriptions offered in the parties' Local Rule 56.1 statements, and it is "satisfied that the citation to evidence in the record supports the assertion[s]" made in the 56.1 statements.  *Vt. Teddy Bear Co.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

. . .

> 20.    [Atlas] shall obtain and maintain additional
> insured status on a primary and non-contributory basis
> irrespective of any other insurance, where collectible or
> not, and will not require contribution by JTM, Owner,
> their officers, directors, agents and employees, Building
> Owner, Landlord, Managing Agent, Lender and all
> applicable additional indemnities ... [JT Magen], Owner,
> their officers, directors, agents and employees, Building
> Owner, Landlord, Managing Agent, Lender and all
> applicable additional indemnities if any, their respective
> agents, officers, directors, employees and partners and
> any other Indemnitees shall be named as an additional
> insured by endorsement ... or their equivalent.

(Pl. 56.1 ¶ 13; *see* Purchase Order ¶¶ 17, 20).

### 3.    The Underlying Action

In August 2017, Robert Woodward, an Atlas employee, initiated a

personal injury lawsuit in the Supreme Court of the State of New York, New

York County, bearing Index No. 156960/2017 (the "Underlying Action").  (Pl.

56.1 ¶ 14; Def. 56.1 ¶ 28).  To the Court's knowledge, that action is still

pending.  (*See* Def. 56.1 ¶ 51).  The lawsuit names JT Magen, NBCUniversal,

and Tishman as defendants (collectively, the "Tort Defendants").  The general

thrust of Woodward's allegations in the complaint in the Underlying Action (the

"Tort Complaint") is that "on or prior to January 7, 2015, while acting within

the scope of his employment at the aforesaid Premises/construction site,

[Woodward] was injured by an unsafe condition, consisting of an

excavation/trench."  (Tort Complaint ¶ 59).  The Tort Complaint goes on to

claim that the Tort Defendants are liable for said accident because "the[y],

and/or each of them, and/or their agents, servants, associates and/or

employees were negligent, careless and reckless" in failing to maintain proper workplace safety, including by "fail[ing] and omit[ting] to properly secure the work area so that [Woodward] could perform his labor in a safe environment." (*Id.* ¶ 64). In the Bill of Particulars submitted in the Underlying Action, Woodward further elaborated:

> The accident happened, when [Woodward], while carrying a box of materials, was forced to crouch down and walk under a scaffold that was positioned in the doorway, in order to access his work area and while doing so, bumped his head on a portion of the scaffold, while at the same time, stepping into a 6" to 8" deep trench measuring approximately 8' wide and 60'-80' long. As a result of the elevation difference and hitting his head, [Woodward] lost his balance and fell.

(Bill of Particulars ¶ 6).

Woodward did not name Atlas as a defendant in the Underlying Action, but in March 2018, the Tort Defendants filed a third-party complaint against Atlas pursuant to Rule 3402(b) of the New York Civil Practice Law and Rules (the "Third-Party Complaint"). (Pl. 56.1 ¶ 20; Def. 56.1 ¶ 29). In the Third-Party Complaint, the Tort Defendants also impleaded another subcontractor involved with the Project, Port Morris Tile & Marble Corp., which is not a party to the instant suit. (*See generally* Third-Party Complaint). The Tort Defendants state that such "impleader is made against Atlas and Port by reason of their wrongful conduct in the performance of certain work . . . [and] improper rendering of services pursuant to [their respective] Purchase Order Agreements." (*Id.* ¶ 11). They further allege with regard to Atlas in particular that "the accident and concomitant personal injuries which form the basis for

the [Underlying] Action arise out of and/or result from the performance of Atlas' work under the [Purchase Order]." (*Id.* ¶ 14).

Some of the discovery produced in the Underlying Action is relevant to the instant action. Atlas's general foreman on the Project, William Kurpis, testified that he had some awareness of the potential tripping hazard prior to Woodward's alleged injury, and notified JT Magen of the same. (Donnelly Decl., Ex. 10 at 85-89). However, Kurpis also testified that Atlas had not created the cutout[3] or placed the scaffolding that was on the mezzanine on the day of Woodward's alleged accident. (*Id.*, Ex. 10 at 48, 85, 92, 95-96).[4] A JT Magen employee involved with the project, Mark Hackett, stated that other non-party subcontractors were responsible for the creation of the cutout involved in Woodward's alleged accident. (*Id.*, Ex. 13 at 21-23).

In December 2015, Plaintiff tendered a claim for coverage to Defendant on behalf of the Tort Defendants. (Pl. 56.1 ¶ 23). Defendant denied the tender in December 2016, on the grounds that the Underlying Action had not yet been

---

[3]    The various documents submitted with the parties' motions, including documents originally created or submitted in the Underlying Action, alternately reference a "cutout," "trench," or "inlay." The Court understands these terms to refer to the same feature, which was a height differential that existed in the floor of the mezzanine of the Project location at the time of Woodward's alleged injuries. (*See* Pl. 56.1 ¶ 19). The Court will primarily refer to this feature as the "cutout," although it may be referred to otherwise in quotations from the record.

[4]    The Court acknowledges that there is some disagreement about how to characterize the substance of the testimony provided in the Underlying Action. "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). As such, the Court only utilizes the parties' characterizations when they are supported by its independent review of the record. *Id.*

filed.  (*Id.* ¶ 24).  Plaintiff renewed its tender to Defendant in August 2017, which tender Defendant again denied the following month.  (*Id.* ¶¶ 25-26).  This time, however, Defendant explained that it had no duty to indemnify for largely the same reasons it invokes in the instant case.  (*See* Donnelly Decl., Ex. 19).  Accordingly, Plaintiff has been defending the Tort Defendants in the Underlying Action to date.  (Pl. 56.1 ¶ 27).

## B.    Procedural History

Plaintiff began the instant action by filing the Complaint on March 16, 2022.  (Dkt. #1).  Defendant responded by filing an answer on April 18, 2022.  (Dkt. #10).  The parties appeared for an initial pretrial conference on June 7, 2022, after which the Court entered the parties' proposed case management plan.  (*See* Minute Entry for June 7, 2022; Dkt. #13).  After discovery concluded in October 2022, the Court convened another pretrial conference on October 13, 2022, at which the both parties stated their intention to file cross-motions for summary judgment and the Court set a briefing schedule for such motions.  (*See* Minute Entry for Oct. 13, 2022).

Plaintiff filed its motion for summary judgment and accompanying papers on November 18, 2022.  (Dkt. #18-21).  Defendant filed its consolidated cross-motion and opposition and accompanying papers on December 16, 2022.  (Dkt. #24-27).  Plaintiff filed a brief in opposition to Defendant's motion and in further support of its own on January 13, 2023.  (Dkt. #28-29).  On January 27, 2023, Defendant filed its reply in support of its cross-motion, concluding the briefing for the two motions.  (Dkt. #30).

**DISCUSSION**

## A.    Applicable Law

### 1.    Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[5]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial."

---

[5]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations, quotation marks, and emphasis omitted).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

### 2.     Interpretation of Insurance Contracts

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." *Porco* v. *Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (quoting *In re Ests. of Covert*, 97 N.Y.2d 68, 76 (2001) (internal quotation marks omitted)).  Under New York law, the interpretation of a contract "is a matter of law for the court to decide." *Int'l Multifoods Corp.* v. *Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal citation omitted); *see also Parks Real Est. Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ("[T]he initial interpretation of a contract is a matter of law for the court to decide." (internal quotation marks and citation omitted)).

"As with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning[.]" *Gilbane Bldg. Co./TDX Constr. Corp.* v. *St. Paul Fire & Marine Ins. Co.*, 31 N.Y.3d 131, 135 (2018) ("*Gilbane II*") (quoting *Vigilant Ins. Co.* v. *Bear Stearns Cos., Inc.*, 10 N.Y.3d 170, 177 (2008) (internal quotation marks omitted)).  "If the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness

and equity." *White* v. *Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007) (quoting *Greenfield* v. *Philles Records*, 98 N.Y.2d 562, 570 (2002) (internal quotation marks omitted)). "If the terms of a policy are ambiguous, however, any ambiguity must be construed in favor of the insured and against the insurer." *Id.*

### 3.    The Duty to Defend

"The duties to defend and indemnify are separate and distinct; the former is a form of litigation insurance for the insured." *Barney Greengrass, Inc.* v. *Lumbermens Mut. Cas. Co.*, 445 F. App'x 411, 413 (2d Cir. 2011) (summary order) (internal quotation marks and citations omitted).  Under New York law, "the duty of an insurer to defend its insured is 'exceedingly broad' and far more expansive than the duty to indemnify its insured." *High Point Design, LLC* v. *LM Ins. Corp.*, 911 F.3d 89, 94-95 (2d Cir. 2018) (quoting *Cont'l Cas. Co.* v. *Rapid-Am. Corp.*, 80 N.Y.2d 640, 648 (1993)); *accord Regal Constr. Corp.* v. *Nat'l Union Fire Ins. Co. of Pittsburgh*, 15 N.Y.3d 34, 37 (2010).  "[T]he insurer's duty to provide a defense is invoked 'whenever the allegations in a complaint against the insured fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be.'" *High Point Design, LLC*, 911 F.3d at 95 (quoting *Seaboard Sur. Co.* v. *Gillette Co.*, 64 N.Y.2d 304, 310 (1984)).  Thus, "the general rule in determining whether an insurer has a duty to defend is to compare the allegations of the complaint with the operative insurance policy." *Int'l Bus. Machs. Corp.* v. *Liberty Mut. Ins. Co.*, 363 F.3d 137, 148 (2d Cir. 2004).  An insurer must defend even if "facts

12

outside the four corners of those pleadings indicate that the claim may be meritless or not covered[.]"  *Int'l Bus. Machs. Corp.* v. *Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 427 (2d Cir. 2002) (quoting *Fitzpatrick* v. *Am. Honda Motor Co.*, 78 N.Y.2d 61, 63 (1991) (internal quotation marks omitted)).  "If the allegations of the complaint are even potentially within the language of the insurance policy, there is a duty to defend."  *High Point Design, LLC*, 911 F.3d at 95 (quoting *Town of Massena* v. *Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435, 443 (2002) (internal quotation marks omitted)).

New York law further provides that in some circumstances, the duty to defend can be triggered whenever the insurer "has actual knowledge of facts establishing a reasonable possibility of coverage[.]"  *Fitzpatrick,* 78 N.Y.2d at 67.  "The question of when facts extrinsic to a complaint may either trigger a duty to defend or terminate that duty at a subsequent date remains somewhat unclear under New York law."  *622 Third Ave. Co., L.L.C.* v. *Nat'l Fire Ins. Co. of Hartford*, No. 21 Civ. 6050 (KPF), 2022 WL 17736796, at *6 (S.D.N.Y. Dec. 16, 2022); *see also Stein* v. *N. Assur. Co. of Am.*, 617 F. App'x 28, 31 n.4 (2d Cir. 2015) (summary order) ("We have previously recognized that New York law is 'unclear' regarding the circumstances in which a court may consider extrinsic evidence in making coverage determinations." (internal citations omitted)); *Int'l Bus. Machs. Corp.*, 303 F.3d at 426 ("[T]here is no consistent rule from New York's lower courts [as to] whether New York law allows reference to extrinsic evidence in determining the duty to defend[.]").  Nonetheless, in general, the duty to defend "can be triggered when the insurer has knowledge of facts [that]

13

are extrinsic to the complaint" that establish a reasonable possibility of coverage, and "that is so even if the extrinsic facts post-date the tender." *Zurich Am. Ins. Co.* v. *XL Ins. Am., Inc.*, 547 F. Supp. 3d 381, 404 (S.D.N.Y. 2021) (internal quotation marks and citations omitted), *reconsidered on other grounds*, 556 F. Supp. 3d 301 (S.D.N.Y. 2021).

That said, "[t]he insurer's duty to defend is … not an interminable one, and will end if and when it is shown unequivocally that the damages alleged would not be covered by the policy." *Sturges Mfg. Co.* v. *Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 74 (1975). In other words, where an insurer's duty to defend turns on an unresolved factual dispute, "the duty to defend lasts only until the factual ambiguity is resolved in favor of the insurer." *Hugo Boss Fashions, Inc.* v. *Fed. Ins. Co.*, 252 F.3d 608, 622 (2d Cir. 2001); *see also Avondale Indus., Inc.* v. *Travelers Indem. Co.*, 774 F. Supp. 1416, 1425 (S.D.N.Y. 1991) (The "duty to defend continues until judicial determination, either in [the] underlying action or in [the] coverage action, of [the] issue relevant to coverage." (citing *Colon* v. *Aetna Life & Cas. Ins. Co.*, 66 N.Y.2d 6, 10 (1985))).

### 4. Ripeness in Declaratory Judgment Actions

"Article III of the Constitution limits the 'judicial Power of the United States' to 'Cases' and 'Controversies.'" *Admiral Ins. Co.* v. *Niagara Transformer Corp.,* 57 F.4th 85, 91 (2d Cir. 2023) (quoting U.S. CONST. art. III, §§ 1-2). The Declaratory Judgment Act (the "DJA") empowers federal courts to declare the rights of parties in ripe cases or controversies by "provid[ing] that '[i]n a case of actual controversy within its jurisdiction, … any court of the United States …

14

may declare the rights and other legal relations of any interested party seeking
such declaration, whether or not further relief is or could be sought."  *Id.* at 92
(quoting 28 U.S.C. § 2210(a)).  "In other words, the DJA creates a means by
which rights and obligations may be adjudicated in cases involving an actual
controversy that has not reached the stage at which either party may seek a
coercive remedy."  *Id.* (internal quotation marks and citation omitted).  With
regards to litigation over insurance coverage in particular, the declaratory
judgment mechanism has "become the paradigm for asserting jurisdiction
despite future contingencies that will determine whether a controversy ever
actually becomes real."  *E.R. Squibb & Sons, Inc.* v. *Lloyd's & Cos.*, 241 F.3d
154, 177 (2d Cir. 2001) (quoting *Assoc. Indem. Corp.* v. *Fairchild Indus., Inc.*,
961 F.2d 32, 35 (2d Cir. 1992)).  "That the liability may be contingent does not
necessarily defeat jurisdiction of a declaratory judgment action."  *Id.* (quoting
*Assoc. Indem. Corp.*, 961 F.2d at 35).

However, just because a court *may* hear a DJA claim does not mean that
it *must*.  Under the DJA, a "court retains discretion … to refuse to exercise
jurisdiction over a declaratory judgment action that it would otherwise be
empowered to hear."  *Liberty Ins. Corp.* v. *N.Y. Marine & Gen. Ins. Co.*, No. 22
Civ. 1081 (DLC), 2023 WL 2597053, at *8 (S.D.N.Y. Mar. 22, 2023) (internal
quotation marks and citation omitted).  That discretion includes a "wide
latitude to address … factors as relevant to the ultimate question of whether
'the normal principle that federal courts should adjudicate claims [over which
they have] jurisdiction' should 'yield[ ] to considerations of practicality and wise

judicial administration' in a particular case[.]" *Admiral Ins. Co.*, 57 F.4th at 100 (quoting *Wilton* v. *Seven Falls Co.*, 515 U.S. 277, 288 (1995)).

**B.   Analysis**

In its motion for partial summary judgment, Plaintiff seeks a declaration that (i) Defendant has a duty to defend the Tort Defendants in the Underlying Action and (ii) Defendant's obligation is primary and non-contributory.  (Dkt. #18).  In its cross-motion for summary judgment, Defendant opposes Plaintiff's motion and seeks a declaration that (i) it has no duty to defend or indemnify the Tort Defendants in the Underlying Action, (ii) Plaintiff's policy is not excess to Defendant's, and (iii) Defendant has no obligation to reimburse Plaintiff for defense costs.  (Def. Opp. 1).  Notably, only Defendant has moved on the issue of its duty to indemnify, arguing that the issue is not ripe for adjudication or alternatively should be dismissed because no such duty exists.  (*Id.* at 30-31).

For the reasons that follow, the Court finds that the Tort Defendants qualify as additional insureds under the Harleysville Policy, and that there is a reasonable possibility of coverage in the Underlying Action that triggers Defendant's duty to defend.  However, the Court finds that it cannot rule on the priority of coverage because of deficient information about other potentially relevant insurance policies.  Finally, the Court reserves judgment on Defendant's duty to indemnity because liability has not yet been assigned in the Underlying Action.

1.   **The Harleysville Policy Does Not Require Direct Privity of Contract for Additional Insured Coverage and the Tort Defendants Qualify as Additional Insureds**

"[W]hen determining whether a third party is an additional insured under an insurance policy, a court must ascertain the intention of the parties to the policy, as determined from *within the four corners of the policy itself."* *Cincinnati Ins. Co.* v. *Harleysville Ins. Co.*, 709 F. App'x 71, 74 (2d Cir. 2017) (summary order) (quoting *77 Water St., Inc.* v. *JTC Painting & Decorating Corp.*, 50 N.Y.S.3d 471, 475 (2d Dep't 2017) (internal quotation marks omitted)). Defendant contends that the specific language of the Harleysville AI Provision requires direct privity of contract between Atlas and any party seeking coverage as an additional insured.  (Def. Opp. 17-23).  Defendant does not contest that there is privity between Atlas and JT Magen, given the existence of the Purchase Order.  (*Id.* at 21).  But because it is undisputed that Tishman and NBCUniversal never entered into an agreement with Atlas, Defendant argues that a privity requirement would mean that they are *not* additional insureds, and that Defendant accordingly has duty to indemnify or defend them. Defendant's central argument in favor of a privity requirement is that the language of the Harleysville AI Provision is analogous to the language at issue in a line of New York cases requiring privity.  (*Id.* at 20-22).  In point of fact, although the policies at issue in those cases bear a superficial similarity to the Harleysville AI Provision, a more careful comparison of the provisions reveals significant distinctions.

17

For example, Defendant relies heavily on *AB Green Gansevoort, LLC* v. *Peter Scalamandre & Sons, Inc.*, 961 N.Y.S.2d 3 (1st Dep't 2013).  The policy at issue in *AB Green* stated that an organization is added as an additional insured "*when you and such organization have agreed in writing* in a contract or agreement that such organization be added as an additional insured on your policy."  *Id.* at 4 (emphasis added) (alterations omitted).  The *AB Green* court read the phrase "have agreed in writing" to mean that "[t]he policy does not provide that there only be some writing, but rather that there be a written contract between the named insured and the organization seeking coverage."  *Id.* at 5.  In other words, the policy explicitly required direct privity between the insured and any additional insureds.

The converse is true here.  The Harleysville AI Provision defines an additional insured as "any person or organization for whom you are performing operations, only as specified under *a* written contract or agreement that requires such person or organization be added as an additional insured on 'your' policy."  (*See* Harleysville AI Provision (emphasis added)).  Unlike the provision at issue in *AB Green*, the Harleysville AI Provision does not require that there be a contract between the party seeking coverage and the named insured.  Rather, the party seeking coverage only needs to be specified as an additional insured under "*a* written contract or agreement" between unspecified parties.  The Harleysville AI Policy is exactly the counterexample that the *AB Green* court provided, as it merely requires that there "only be some writing."  *AB Green*, 961 N.Y.S.2d at 5 ("The policy does not provide that

18

there only be some writing, but rather that there be a written contract between the named insured and the organization seeking coverage.").

The other cases on which Defendant relies are distinguishable on similar grounds.  *See Gilbane II*, 31 N.Y.3d at 135 (interpreting policy defining additional insured as "any person or organization *with whom you have agreed* to add as an additional insured by written contract" to require privity (emphasis added)); *Linarello* v. *City Univ. of New York*, No. 105684/00, 2003 WL 25669421, at *3 (N.Y. Sup. Ct. Mar. 20, 2003) (interpreting policy defining additional insured as "any person or organization for whom you are performing operations *when you and such person or organization have agreed* in writing in a contract or agreement that such person or organization be added as an additional insured to your policy" to require privity (emphasis added)), *aff'd*, 774 N.Y.S.2d 517, 520 (1st Dep't 2004); *Travelers Prop. Cas. Co. of Am.* v. *Harleysville Ins. Co. of New York*, No. 651812/2017, 2020 WL 3089269, at *2 (N.Y. Sup. Ct. June 5, 2020) (reaching same conclusion for policy defining additional insured as "any person or organization for whom you are performing operations *when you and such person or organization have agreed* in writing in a contract or agreement that such person or organization be added as an additional insured" (emphasis added)).  Unlike the language of the Harleysville AI Policy, the language in each of these cases explicitly requires direct privity.

Furthermore, the present language is semantically similar to additional insured definitions that courts have found to not require privity.  In *Vargas* v. *City of New York*, for instance, the First Department found that an

19

endorsement that defined an additional insured as someone "required by written contract signed by both parties prior to any 'occurrence' in which coverage is sought" did not require privity.  71 N.Y.S.3d 415, 417 (1st Dep't 2018) (internal quotation marks omitted).  The First Department concluded similarly for an insurance contract that defined an additional insured as "[a]ny entity required by written contract ... to be named as an insured."  *Netherlands Ins. Co.* v. *Endurance Am. Specialty Ins. Co.*, 66 N.Y.S.3d 441, 442 (1st Dep't 2018).  Likewise, in *77 Water St., Inc.* v. *JTC Painting & Decorating Corp.*, the Second Department did not require privity where the insurance coverage "included entities as required by written contract with [named insured]."  50 N.Y.S.3d at 474-75 (internal quotation marks omitted).  *See also Eilerson Dev't Corp.* v. *Selective Ins. Grp., Inc.*, 542 F. Supp. 3d 177, 186 (N.D.N.Y. 2021) (finding privity not required under contract defining an additional insured as "any person or organization whom [named insured] agreed in a written contract, written agreement or written permit that such person or organization be added as an additional insured on [the] policy"), *aff'd sub nom. Amerisure Ins. Co.* v. *Selective Ins. Grp., Inc.*, No. 21-1516-cv, 2023 WL 3311879, at *2 n.2 (2d Cir. May 9, 2023) (noting that "[t]he parties also d[id] not dispute" on appeal that privity is not required).  The Harleysville AI Provision similarly requires only that the additional insureds be specified under *a* contract, and does not require that the party seeking coverage be a party to that agreement.

20

The Purchase Order — which was executed by JT Magen and Atlas — is unambiguously a contract that requires that the Tort Defendants be added as additional insureds on Atlas's insurance.  Specifically, it states that:

> Subcontractor will submit project specific insurance documents … specifically naming [JT Magen], Owner, their officers, directors, agents and employees, Building Owner, Landlord, Managing Agent, Lender and all applicable additional indemnitees … as an additional insured afforded on a primary and non-contributory basis[.]

(Purchase Order ¶ 17).[6]  Defendant accepts that the Purchase Order is a written contract that can confer additional insured status under the Harleysville AI Provision, insofar as it does not contest that the Purchase Order granted additional insured status to JT Magen.  (Def. Opp. 21-22).  It is the logical next step to extend that conclusion to the Tort Defendants.

That the Harleysville AI Provision limits additional insured status to "any person or organization *for whom* [the named insured is] performing operations" is also not a direct privity requirement.  (*See* Harleysville AI Provision).  The

_____

[6]     Although the Purchase Order does not specifically define NBCUniversal and Tishman as "Owner" and "Managing Agent," respectively, the circumstances surrounding the formation of the Purchase Order make clear that this language reflects the signatories' manifestation of intent that Atlas be obligated to provide insurances for them.  "Under New York law, [contracts are interpreted] by looking to 'the objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'"  *SR Int'l Bus. Ins. Co.* v. *World Trade Ctr. Properties, LLC*, 467 F.3d 107, 125 (2d Cir. 2006) (quoting *Brown Bros. Elec. Contractors, Inc.* v. *Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977)).  The Court also looks to the parties' "reasonable expectations [as] determined based on an objective understanding of the attendant circumstances in which the agreement was made, the situation of the parties, and the objectives they were striving to attain."  *Id.* (internal quotations, citations, and alterations omitted).  In the specific commercial context in which the agreement was made, the terms "Owner" and "Managing Agent" are not ambiguous and clearly refer to NBCUniversal and Tishman, respectively, even if the contract terms are not expressly defined.  Given this clarity, it is unsurprising that Defendant makes no argument to the contrary.

Court must enforce "a written agreement that is complete, clear and unambiguous … according to the plain meaning of its terms[.]"  *Gilbane Bldg. Co./TDX Const. Corp.* v. *St. Paul Fire & Marine Ins. Co.*, 38 N.Y.S.3d 1, 8 (1st Dep't 2016) (internal quotation marks and citations omitted) ("*Gilbane I*"), *aff'd*, 31 N.Y.3d 131 (2018).  Looking first to the plain meaning of the words "for whom," it is possible to perform work *for* a person or organization without having direct privity of contract with them.  *See Emps. Ins. Co. of Wausau* v. *Kingstone Ins. Co.*, No. 17 Civ. 970 (DAB) (SDA), 2019 WL 7040427, at *10 (S.D.N.Y. Dec. 4, 2019) (finding phrase "for whom you are performing operations" to include parties with whom there is not direct privity, but for whose benefit the work was ultimately completed), *report and recommendation adopted*, No. 17 Civ. 3970 (DAB), 2019 WL 6998386 (S.D.N.Y. Dec. 19, 2019); *William Floyd Sch. Dist.* v. *Maxner*, 892 N.Y.S.2d 115, 118 (2d Dep't 2009) (determining that requirement that liability arise out of "ongoing operations performed for that additional insured by the named insured" was not a privity requirement); *accord First Mercury Ins. Co.* v. *Shawmut Woodworking & Supply, Inc.*, 48 F. Supp. 3d 158, 163-167 (D. Conn. 2014) (applying similar Connecticut common law), *aff'd*, 660 F. App'x 30 (2d Cir. 2016) (summary order).  This is because the word "for" may be used in such a context "as a function word to indicate the object or recipient of a perception, desire, or

activity."  *See For*, MERRIAM-WEBSTER DICTIONARY, available at http://merriam-webster.com/dictionary/for (last visited July 28, 2023).[7]

The plain meaning of "performing operations" further supports the Court's reading.  Atlas was clearly performing operations *for* NBCUniversal and Tishman; specifically, it performed electrical work in service of a renovation of the "NBC Universal Lobby," as clearly indicated in the heading of its scope of work.  (*See* Purchase Order at 3 (attached scope of work)).  Atlas was aware that the ultimate beneficiaries of the work described in the Purchase Order were NBCUniversal and Tishman, as demonstrated by the Purchase Order's many references to the ways in which NBCUniversal's expectations did or could shape Atlas's work.  (*See generally id.*).  Furthermore, Atlas's foreman, William Kurpis, testified that Atlas had regular contact with Tishman's building engineer "whenever [Atlas] needed to get into spaces" required to perform the electrical work, making it clear that Tishman had an interest in the work Atlas was performing.  (Carlucci Decl., Ex. 11 at 33).  Although neither party has expounded on what exactly Tishman's role of Managing Agent meant in the context of the Project, Tishman's duties under the "Facilities Management Agreement" between NBCUniversal and Tishman include that "[Tishman] will supervise and coordinate all customary and ordinary capital improvements to the [Project location]."  (Carlucci Decl., Ex. 16 ¶ 3.9).  The Court finds this to be

---

[7]     "New York courts commonly use dictionary definitions to determine such meanings." *Travelers Prop. Cas. Co. of Am.* v. *Netherlands Ins. Co.*, No. 21 Civ. 6061 (PAE), 2023 WL 2339898, at *12 (S.D.N.Y. Mar. 1, 2023) (collecting cases).

uncontroverted evidence supporting an inference that Tishman was in partial control of the Project, and as such Atlas also performed work *for* Tishman in the sense described above.

Conversely, nothing in the record suggests that the Court should narrowly construe "for whom you are performing operations" to refer only to those people with whom Atlas has direct contractual agreement.  This construction is consistent with the commercial necessities generated by the web of contracts that often characterizes construction projects such as the one at issue in the Underlying Action.  Reasonable businesspersons would contemplate such arrangements at the time of contracting, and New York courts consider "the reasonable expectation and purpose of the ordinary business [person] when making an ordinary business contract[.]"  *BP Air Conditioning Corp.* v. *One Beacon Ins. Grp.*, 8 N.Y.3d 708, 716 (2007) (quoting *Album Realty Corp.* v. *Am. Home Assur. Co.*, 80 N.Y.2d 1008, 1010 (1992) (internal quotation marks omitted)).

Defendant also misunderstands *Gilbane*'s holding regarding the difference between "with whom" and "for whom" requirements for additional insured coverage.  In *Gilbane*, the New York Court of Appeals declined to rewrite a contract that limited additional insured coverage to those "with whom" the named insured had a contract to also include those "for whom" the named insured worked.  *Gilbane II*, 31 N.Y.3d at 137.  That case does not, however, stand for the proposition that a policy cannot define an additional insured as a party for whom the named insured performs work.  In the same

vein, this Court cannot and will not rewrite the Harleysville AI Provision to only cover those "with whom" the named insured had a contract, when it explicitly states that coverage extends to any person or organization "for whom" the named insured performed work. The Court's "decision does not undermine an industry market solution aimed at efficiently allocating risk among entities involved in construction projects ... it merely requires contracting parties who desire the result proposed" by Defendant to use language that creates that result. *Id.* at 136 (internal quotation marks, citations, and alterations omitted) (stating that parties who do not desire a privity requirement should "remove the word 'with' from their future contracts"). As such, NBCUniversal and Tishman qualify as additional insureds under the Harleysville AI Provision. And for the reasons explained below, Defendant has a duty to defend its additional insureds in the Underlying Action.

### 2.    The Underlying Action Triggered Defendant's Duty to Defend

Defendant contends in the alternative that because Atlas is not named as a defendant in the Tort Complaint, it has no duty to defend in that action. It reasons that New York follows a "four-corners of the complaint" rule for determining when the duty to defend is triggered, which looks primarily to whether the complaint alleges an occurrence for which there is a reasonable possibility of coverage. (Def. Reply 6). While it is true that "[a]n insurer's duty to defend claims made against its policyholder is ordinarily ascertained by comparing the allegations of a complaint with the wording of the insurance

25

contract," *Int'l Bus. Machines Corp.*, 363 F.3d at 144, Defendant is wrong that this principle absolves it of its defense obligation here.

"It is of no moment that … the named insured … was not named in the complaint[,]" *City of New York* v. *Wausau Underwriters Ins. Co.*, 45 N.Y.S.3d 3, 7 (1st Dep't 2016), because the "four corners of the complaint" rule does not mean that insurers may use complaints to narrow the scope of their duty to defend.  New York courts have made clear that "[w]ooden application of the 'four corners of the complaint' rule would render the duty to defend narrower than the duty to indemnify — clearly an unacceptable result" and "[f]or that reason, courts and commentators have indicated that the insurer must provide a defense if it has knowledge of facts which potentially bring the claim within the policy's indemnity coverage[.]"  *Fitzpatrick*, 78 N.Y.2d at 66 (explaining that "the insurer must provide a defense if it has knowledge of facts which potentially bring the claim within the policy's indemnity coverage," even if it its insured is not named in the complaint).

The concern is particularly acute in cases in which the underlying action involves a New York workplace accident, as Section 29(6) of the New York Workers' Compensation Law specifically precludes private tort actions by employees against employers for workplace injuries.  N.Y. WORKERS' COMP. LAW § 29(6) ("The right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee … when such employee is injured or killed by the negligence or wrong of another in the same employ[.]").  It would be unreasonable to restrict the duty to defend to claims made directly against

named insureds in a statutory system that prevents plaintiffs from suing certain potentially liable parties. And due to the commercial necessity that additional insureds be able to utilize the duty to defend contemplated by the policies relevant to particular business transactions, the use of extrinsic evidence to assess whether the coverage could potentially be triggered is necessary and justified. *Charter Oak Fire Ins. Co.* v. *Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 326-27 (S.D.N.Y. 2020).

Accordingly, the Court looks not only to whether the Tort Complaint explicitly alleges that Atlas was at fault for Woodward's injuries, but also to whether "the insurer has actual knowledge of facts demonstrating that the lawsuit does involve [a covered] occurrence," all to ensure that Defendant does not "avoid its contractual duty to defend its insured." *Fitzpatrick*, 78 N.Y.2d at 63. This requires first defining precisely the occurrences the Harleysville Policy covers. Then, if there is a reasonably possibility that the occurrence at issue in the Underlying Action falls within that category, the duty to defend is triggered, unless it can be "determined *with certainty* that the policy does not provide coverage." *Hugo Boss Fashions, Inc.*, 252 F.3d at 620.

Recall that the Harleysville AI Provision extends coverage

> only with respect to liability caused, in whole or in part, by the acts or omissions of [Atlas], or those acting on behalf of [Atlas], in the performance of the [Atlas]'s ongoing operations for the additional insured only as specified under the "written contract."

(Harleysville AI Provision). There are two attributes worth noting about the extent of coverage this language provides. The first is that the policy, by its

terms, covers claims "caused, in whole or in part" by Atlas's acts or omissions. Under New York law, this language indicates that even partial liability for an injury is sufficient to trigger coverage, as it demonstrates "that the parties did not mean 'solely caused by.'" *Burlington Ins. Co.* v. *NYC Transit Auth.*, 29 N.Y.3d 313, 322 (2017); *accord Starr Indem. & Liab. Co.* v. *Excelsior Ins. Co.*, 516 F. Supp. 3d 337, 348-49 (S.D.N.Y. 2021) (construing coverage for liability "caused, in whole or in part" by the named insured to apply to any situation "where the named insured is more than 0% liable for the underlying plaintiff's injuries"). Therefore, a finding that there is a reasonably possibility that Atlas was partly liable for Woodward's injury is sufficient to trigger Atlas's duty to defend.

And because but-for causation cannot be *in part*, New York courts understand phrases like "caused, in whole or in part" to refer to proximate causation. *Burlington Ins. Co.*, 29 N.Y.3d at 322-24. That said, "the concept of proximate cause, or more appropriately legal cause, has proven to be an elusive one, incapable of being precisely defined to cover all situations[.]" *Derdiarian* v. *Felix Contracting Corp.*, 51 N.Y.2d 308, 314 (1980). It may be established as a *prima facie* matter where there is evidence that a party "was a substantial cause of the events which produced the injury," although ultimately, "[g]iven the unique nature of the inquiry in each case, it is for the finder of fact to determine legal cause." *Id* at 315. However, in a duty to defend inquiry, the Court does not need to fully resolve the complex question of causation. "It is sufficient that there be a 'reasonable possibility' that [the named insured]'s acts

28

or omissions were the proximate cause of the injury." *Zurich Am. Ins. Co.*, 547 F. Supp. 3d at 399.

Defendant is therefore mistaken in asserting that because the New York State court has not yet determined whether Atlas was a proximate cause of the alleged accident, it would be premature at this juncture to decide whether Defendant has a duty to defend. (*See* Def. Opp. 25). Defendant's duty to defend is not triggered by the final adjudication of liability; it is triggered by the initiation of a claim under which its insured may eventually be found liable, as "an insurer may be required to defend under the contract even though it may not be required to pay once the litigation has run its course." *Auto. Ins. Co. of Hartford* v. *Cook*, 7 N.Y.3d 131, 137 (2006). Moreover, this principle does not change just because the parties to whom an insurer owes a duty to defend are additional insureds rather than named insureds, as "additional insured coverage is not contingent upon a liability finding [and] the obligation of an insurer to provide a defense to an additional named insured under the policy exists to the same extent as it does to a named insured." *BP Air Conditioning Corp.*, 8 N.Y.3d at 711.

The second noteworthy aspect of the Harleysville AI Provision is that it incorporates Atlas's scope of work as defined in the Purchase Order. This is because the Harleysville AI Provision only covers liability incurred in the performance of Atlas's ongoing operations for the additional insured as specified under a "written contract." (Harleysville AI Provision). Therefore, Defendant's duty to defend is only triggered if there is a possible factual basis

to conclude that the acts or omissions giving rise to Atlas's possible liability occurred in the course of its performance of work specified in the Purchase Order.

To resolve this issue, the Court follows the approach of New York courts by examining the facts alleged in the Tort Complaint, the extrinsic facts of which Defendant has knowledge, and the Purchase Order to determine whether there is a reasonable possibility that indemnity could be triggered in the Underlying Action.  *See Auriemma* v. *Biltmore Theatre, LLC*, 917 N.Y.S.2d 130, 139 (1st Dep't 2011) (finding in suit alleging workplace injury involving an excavation that "[a]lthough the first-party complaints contain no allegations against [the named insured], they refer to excavation... [and insurer later] had actual knowledge that [named insured] was responsible for excavation … establishing a reasonable possibility of coverage").  Because the facts demonstrate that Atlas's acts or omissions may have been a proximate cause of Woodward's alleged injuries, Defendant's duty to defend has been triggered.

Generally speaking, the Tort Complaint describes an accident in which Woodward was injured by the cutout on the mezzanine.  The Bill of Particulars further specifies that Woodward hit his head on scaffolding before stepping into the cutout, which caused him to trip and fall.  (Bill of Particulars ¶ 6).[8]  The

---

[8]    The Bill of Particulars is correctly considered alongside the Tort Complaint, as it is a document that provides clarifications as to what is alleged in the Tort Complaint.  "New York law allows an insurer to demand a bill of particulars to clear up uncertainties as to whether coverage is necessary[.]"  *Stein* v. *N. Assurance Co. of Am.*, No. 09 Civ. 1029 (TCP) (AKT), 2011 WL 13305251, at *11 (E.D.N.Y. Jan. 25, 2011) (citing *Hugo Boss Fashions, Inc.* v. *Fed. Ins. Co.*, 252 F.3d 608, 622 (2d Cir. 2001)).

Tort Complaint recites that at the time of the alleged accident, Woodward was "acting within the scope of his employment at the aforesaid [Project site]," for a "contractor and/or subcontractor hired by [the Tort Defendants]." (Tort Complaint ¶¶ 59-60). In other words, the Tort Complaint alleges that Woodward was injured in the course of Atlas's performance of the Purchase Order, and Defendant has not identified any extrinsic facts that would indicate to the contrary. This Court has previously found that an employee injured in the scope of their employment with the insured satisfies a coverage requirement that liability arise in the performance of the insured's contract. *622 Third Ave. Co.*, 2022 WL 17736796, at *8-10 (collecting cases). But these facts alone do not satisfy the additional requirement that there be a possibility that Atlas was the proximate cause of said injury.

The extrinsic facts of which Defendant has knowledge fill this gap and establish a reasonable possibility that Atlas was a proximate cause of the accident. That possibility is in part created by the specific obligations that Atlas adopted in the Purchase Order. In relevant part, the Purchase Order states that Atlas was responsible for "initiating, maintaining and supervising all safety precautions and programs in connection with the performance of its Work." (Purchase Order ¶ 5). *First*, this language establishes that any acts or omissions Atlas made regarding workplace safety were within the scope of its performance under the Purchase Order, satisfying that requirement under the Harleysville AI Provision.

31

*Second*, such safety obligations provide a basis on which liability might be found for Atlas.  For example, Atlas may have been a proximate cause of Woodward's injury by allowing him to enter the job site despite knowing of safety hazards at the site.  *See Travelers Indem. Co.* v. *Accredited Sur. & Cas. Co.*, No. 21 Civ. 3412 (CM), 2022 WL 16722107, at *6 (S.D.N.Y. Nov. 4, 2022); *Old Republic Gen. Ins. Corp.* v. *Consol. Edison Co. of N.Y. Inc.*, 146 N.Y.S.3d 620, 622 (1st Dep't 2021) (finding duty to defend where "[named insured] knew that the subject elevator malfunctioned multiple times before the accident … [and] nonetheless allowed its employees to continue to utilize the elevator").  Facts developed in the Underlying Action suggest that this may have actually happened.  For starters, Atlas's foreman admitted in deposition that he knew that there were workplace safety issues, including the tripping hazard on the mezzanine where Woodward was injured, prior to his injury.  (Def. 56.1 ¶ 45).  This is so despite the fact that, as a matter of course, Atlas hosted safety meetings to warn employees about potential safety issues.  (Donnelly Decl., Ex. 6 at 36-38 (Woodard's testimony); *id.*, Ex. 7 at 42-45 (testimony of Atlas executive Arthur Grossman)).  A failure to warn Woodward, therefore, may have been a deficiency in Atlas's performance of its safety program that was a proximate cause of his injuries.  Woodward also attested that there was not a separate safety vendor or contractor at the Project.  (*Id.*, Ex. 6 at 162).  In general, the Purchase Order assigned a broad safety obligation to Atlas, and "[t]he duty to defend is triggered when the insured party has safety obligations at the injury site."  *Travelers Indem. Co.*, 2022 WL 16722107, at *6 (citing *U.S.*

32

*Underwriters Ins. Co.* v. *Image By J & K, LLC*, 335 F. Supp. 3d 321, 331 (E.D.N.Y. 2018)); *cf. DeGidio* v. *City of New York*, 110 N.Y.S.3d 413, 416 (1st Dep't 2019) (finding no defense obligation for crane collapse where named insured "played no role in the crane's maintenance or operation").

Defendant reads the phrase "its Work" in the Purchase Order Safety Provision as limited to safety with regard to the electrical work that Atlas performed.  (Def. Reply 6-8).  As a logical matter, however, the specific tasks enumerated in the Purchase Order's scope of work required ingress and egress to the locations where that electrical work was performed.  The Court sees no reason to exclude ingress and egress safety, as performance of the work necessarily required entering and exiting the locations wherein the work was performed.  *See Chelsea Assocs., LLC* v. *Laquila-Pinnacle*, 801 N.Y.S.2d 15, 17 (1st Dep't 2005) ("The contract could not be performed, of course, unless the subcontractor's employees could reach and leave their workplaces on the job site, and therefore the instant injuries, occurring during such a movement, must be deemed as a matter of law to have arisen out of the work[.]" (internal quotation marks, citations, and alteration omitted)).  Furthermore, Defendant has not adduced any specific evidence supporting an inference that Woodward was not partaking in an activity within the scope of the work contemplated in the Purchase Order at the time of the alleged injury.  On the contrary, for the reasons just explained, the Tort Complaint and the extrinsic facts both support a finding that Woodward could have been performing work specified under the Purchase Order when the alleged accident occurred.

The Purchase Order's reference to "*all* safety precautions and programs"
further indicates that Atlas assumed responsibility for Woodward's safety in
general.  *Cf. Certain Underwriters at Lloyd's, London* v. *Travelers Cas. Ins. Co.
of Am.*, No. 21 Civ. 4125 (FB) (LB), 2023 WL 2652267, at *5-6 (E.D.N.Y.
Mar. 27, 2023) (finding it to be a close question whether a reasonable
possibility of coverage existed where employer "was responsible for the safety of
their employees in the performance of the work at the [p]remises" but was not
accused of specific negligence).  Although there is little precedent regarding the
applicability of the duty to defend in situations involving broad safety
obligations, such as those defined in the Purchase Order, applying the duty to
defend in such circumstances comports with the general notion that "[a]n
insurer's duty to defend its insured is exceedingly broad," covering any
situation that might "bring the claim even potentially within the protection
purchased[.]" *Regal Constr. Corp.*, 15 N.Y.3d at 37.  It also aligns with findings
that the coverage requirements of additional insured provisions similar to the
one at issue here do not focus "on the precise cause of the accident but the
general nature of the operation in the course of which the injury was
sustained." *Worth Const. Co.* v. *Admiral Ins. Co.*, 10 N.Y.3d 411, 416 (2008)
(quoting *Impulse Enters./F & V Mech. Plumbing & Heating* v. *St. Paul Fire &
Mar. Ins. Co.*, 723 N.Y.S.2d 177, 179 (1st Dep't 2001) (internal quotation marks
omitted)).

Furthermore, "the insurer's duty to provide a defense is invoked
'whenever the allegations in a complaint against the insured fall within the

scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be.'" *High Point Design, LLC*, 911 F.3d at 95 (quoting *Seaboard Sur. Co.* v. *Gillette Co.*, 64 N.Y.2d 304, 310 (1984)).  Under the Harleysville AI Provision, Defendant assumed the risk of liability caused by Atlas's performance of ongoing operations for the Tort Defendants, which in this case included Atlas's duty to maintain workplace safety.  Given the facts alleged in the Tort Complaint, viewed alongside the relevant extrinsic evidence, there is a reasonable possibility that Woodward's injury was proximately caused by the acts and omissions of Atlas in the performance of its workplace safety obligations.

Defendant's arguments that coverage is not possible in these circumstances are unconvincing.  Defendant relies primarily on an argument that Atlas did not place the scaffolding and that it was not responsible for the cutout.  (Def. Opp. 2-4).  Assuming *arguendo* that Defendant is correct as to these facts, it has still not eliminated the possibility that Atlas was a proximate cause of the alleged accident.  It may be simultaneously true that other entities were responsible for the scaffolding and cutout and also that Atlas's failure to adequately provide and supervise its own safety programs was a proximate cause of Woodward's alleged injury.  "[T]he concept of proximate cause embraces the possibility of multiple causes of an injury." *Liberty Mut. Ins. Corp.* v. *N.Y. Marine & Gen. Ins. Co.*, 505 F. Supp. 3d 260, 272 (S.D.N.Y. 2020), *modified in part on reconsideration*, 590 F. Supp. 3d 597 (S.D.N.Y. 2022).  For the same reasons, Atlas's potential liability is not foreclosed by the fact that JT

35

Magen also had obligations to "develop, maintain, and enforce a safety program[.]" (Construction Management Agreement ¶ 15.1).  It is possible that both JT Magen and Atlas are liable for failures in maintaining their safety obligations; in such a circumstance, Defendant would still have a duty to defend.[9]  That is why the general principle that "if the area of injury was solely one party's safety responsibility, and the insured party simply sends the injured person to that area, the insured party is not liable," *Travelers Indem. Co.*, 2022 WL 16722107, at *6, does not absolve Atlas's duty to defend here. Under the Purchase Order, Atlas had broad safety obligations to its employees at the Project (and accident) location.

Furthermore, the nature of the "safety precautions and programs" that Atlas was required to provide may be unspecified in the Purchase Order, but this vagueness actually favors the conclusion that Defendant has a duty to defend, as ambiguities are to "be resolved in favor of the insured and against the insurer." *Brabender* v. *N. Assurance Co. of Am.*, 65 F.3d 269, 273 (2d Cir. 1995).  Moreover, the open-ended nature of Atlas's obligation actually expands the possibility that Atlas may be found liable, as the language provides a broad basis on which it might be established that Atlas was a proximate cause of Woodward's injury.

_____

[9]     Defendant incorrectly suggests that *Naughton* v. *City of New York*, 940 N.Y.S.2d 21 (1st Dep't 2012), would require Atlas to have a supervisory role with regards to safety obligations for liability to be possible.  (Def. Opp. 28).  *Naughton* requires actual supervision or control only for certain claims of common-law indemnification, and not the contractual indemnification at issue here.  *Naughton*, 940 N.Y.S.2d at 28-29.

In sum, Defendant's duty to defend is triggered because there is a reasonable possibility that Atlas's acts or omissions with regards to workplace safety were a substantial cause of the alleged accident, and "an insurer is relieved of the duty to defend only if there is no possible factual or legal basis on which [the insurer] might eventually be held to be obligated to indemnify [the insured] under any provision of the insurance policy." *Allianz Ins. Co.* v. *Lerner*, 416 F.3d 109, 115 (2d Cir. 2005) (internal quotation marks and citation omitted). Defendant has failed to "eliminate the possibility" that there may be coverage in the Underlying Action, *Stein*, 617 F. App'x at 31-32, and as such the Court finds that it has a duty to defend the Tort Defendants.

### 3.     The Court Declines to Determine the Priority of Coverage

The parties next dispute whether the Harleysville Policy is primary and non-contributory to the Travelers Policy. It is undisputed that both the Harleysville Policy and the Travelers Policy provide coverage for personal injury liability of the kind alleged in the Underlying Action. (*See* Pl. Br. 11; Def. Opp. 29). The parties further agree that the relevant legal principle guiding the determination as to priority of coverage is that "[w]here the same risk is covered by two or more policies, each of which was sold to provide the same level of coverage (as is the case here), priority of coverage (or, alternatively, allocation of coverage) among the policies is determined by comparison of their respective other insurance clauses." *Charter Oak Fire Ins. Co.*, 462 F. Supp. 3d at 327

(quoting *Sport Rock Int'l* v. *Am. Cas. Co.*, 878 N.Y.S.2d 339, 344 (1st Dep't 2009) (internal quotation marks omitted)).[10]

However, the Court may not determine priority of coverage at this juncture because there are other insurers implicated in the Underlying Action who are not before the Court and whose policies have not been produced. "In order to determine the priority of coverage among different policies, a court must review and consider all of the relevant policies at issue[.]" *BP Air Conditioning Corp.*, 8 N.Y.3d at 716. The Court is unable to do so here because the parties have failed to adduce all of the potentially relevant policies. Multiple documents in the papers submitted in conjunction with the instant motions reference Port Morris Tile & Marble Corp., and its insurer Old Republic General Insurance Corp., as being parties potentially liable in the Underlying Action. (*See generally* Third-Party Complaint; *see also* Complaint, Ex. D (declination of tender letter from claim representative for Old Republic General Insurance Corp.)). Additionally, emails between Defendant's and Plaintiff's respective claims representatives imply that there was also a tender from an insurer for Tishman in relation to the Underlying Action and that Atlas had an excess carrier. (Donnelly Decl., Ex. 18).

---

[10]     There is a rarely-invoked exception that applies when one policy is "[a]n umbrella policy, which covers multiple risks but offers no primary coverage" and the other policy provides primary coverage. *Amerisure Ins. Co.* v. *Selective Ins. Grp., Inc.*, No. 21-1516-cv, 2023 WL 3311879, at *4 (2d Cir. May 9, 2023) (summary order) (quoting *State Farm Fire & Cas. Co.* v. *LiMauro*, 65 N.Y.2d 369, 371 (1985)). This exception is inapplicable here, as both policies can provide primary coverage under certain circumstances. (*See* Travelers Policy § IV(4)(a)); Harleysville AI Endorsement ¶ D).

When "none of the other insurance carriers are parties to this declaratory judgment action and … other relevant policies have [not] been submitted, the priority of coverage cannot be determined." *BP Air Conditioning Corp.*, 8 N.Y.3d at 716; *accord Turner Cost. Co.* v. *Kemper Ins. Co.*, 341 F. App'x 684, 687 (2d Cir. 2009) (summary order); *Williams* v. *Nik-Net LLC*, No. 12 Civ. 3310 (PKC) (RML), 2016 WL 11269180, at *7 n.12 (E.D.N.Y. Jan. 7, 2016).  This is especially relevant given the specific language of the Harleysville AI Endorsement's other insurance provision.  While such provision does state that "[i]f specifically required by the written contract or agreement … any coverage provided by this endorsement to an additional insured shall be primary," it also states that the "coverage shall share with other insurance available to the additional insured which is conferred onto said person or organization by a separate additional insured endorsement." (Harleysville AI Endorsement ¶ D(2)).  Plaintiff has not adduced any evidence establishing that no such separate endorsements exist.  The Court acknowledges that any coverage disputes with the above-mentioned parties and insurers may have been otherwise settled or resolved.  Regardless, the Court cannot determine priority of coverage without information about all relevant policies, and this information has not been produced by the parties.  As such, the Court denies Plaintiff's motion on the priority of coverage issue without prejudice.

### 4. The Court Declines to Exercise Its Jurisdiction to Address Defendant's Duty to Indemnify

Defendant next asks the Court to find that it has no duty to indemnify, or in the alternative, that the issue of indemnification is not ripe for

adjudication.  (Def. Opp. 23, 30-31).  Plaintiff has not moved for summary judgment as to indemnity.  "It is settled that '[e]ven in diversity actions, ... federal law controls the justiciability of declaratory judgment actions.'"  *Stoncor Grp., Inc.* v. *Peerless Ins. Co.*, 322 F. Supp. 3d 505, 512 (S.D.N.Y. 2018) (quoting *Rosen* v. *Mega Bloks Inc.*, 2009 WL 929474, at *2 (S.D.N.Y. Apr. 7, 2009)).  Examining ripeness in this context requires the resolution of two questions: *first*, whether the requirements of Article III of the Constitution and the DJA are satisfied so that subject matter jurisdiction exists, and *second*, whether it is prudent for the Court to exercise that jurisdiction given the specific circumstances of the case.  *Admiral Ins. Co.* 57 F.4th at 96 ("[S]hould the district court determine ... that it has jurisdiction ... it may nevertheless decline to exercise such jurisdiction[.]").  With regards to the presence of Constitutional ripeness, subject matter jurisdiction exists because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Atl. Cas. Ins. Co.* v. *Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 260 (S.D.N.Y. 2013) (quoting *In re Prudential Lines Inc.*, 158 F.3d 65, 70 (2d Cir. 1998) (internal quotation marks omitted)), *aff'd sub nom. Atl. Cas. Ins. Co.* v. *Greenwich Ins. Co.*, 548 F. App'x 716 (2d Cir. 2013) (summary order).  However, the Court finds that given the posture of the Underlying Action, "considerations of practicality and wise judicial administration" require the Court to decline to exercise that jurisdiction at this time, as is permitted under the DJA.  *Admiral*

*Ins. Co.*, 57 F.4th at 100 (internal quotation marks, citations, and alteration omitted).

The Court begins by correcting Defendant's misperception of the law of ripeness.  In support of its request in the alternative, Defendant incorrectly asserts that, as a constitutional matter, federal courts lack subject matter jurisdiction over declaratory judgment actions seeking a declaration on indemnity prior to liability being finally established in the underlying action. (*See* Def. Opp. 30-31).  To the contrary, declaratory judgment actions regarding the duty to indemnify may be ripe even if liability has not been finally established in the underlying action.  *See Stoncor Grp., Inc.*, 322 F. Supp. 3d at 511-12 (collecting cases).  That is because parties' adverse interests regarding indemnity may be "of sufficient immediacy and reality" to establish a live controversy even before it is certain that an insurer will be called upon to indemnify.  *See Admiral Ins. Co.,* 57 F.4th at 92-93.  In other words, "[t]hat the [insurer's] liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action ... [r]ather, courts should focus on 'the practical likelihood that the contingencies will occur.'"  *Assoc. Indem. Corp.*, 961 F.2d at 35; *see also Admiral Ins. Co.*, 57 F.4th at 93 (explaining that to establish subject matter jurisdiction over a question of the duty to indemnify, "the court must find a practical likelihood that the third party will *prevail* in such litigation" (emphasis in original)).

For substantially the same reasons that Defendant has a duty to defend, the Court finds that the factual circumstances show a practical likelihood that

41

a liability finding against Atlas will be entered in the Underlying Action, and as such the issue is ripe.[11]  There are obviously numerous contingencies embedded in the evaluation of the probability that Atlas will be found liable in the Underlying Action, including how the court in that action will weigh the respective evidence.  However, the Court still finds that the record indicates a practical likelihood (although not a certainty) that the New York court will find that Atlas's acts and omissions were a substantial cause of Woodward's injuries.

That a practical likelihood exists is more obvious when "some form of judgment or settlement will be forthcoming" in the underlying action.  *Lafarge Canada Inc.* v. *Am. Home Assurance Co.*, No. 15 Civ. 8957 (RA), 2018 WL 1634135, at *5 (S.D.N.Y. Mar. 31, 2018) (citing *Fed. Ins. Co.* v. *SafeNet, Inc.*, 758 F. Supp. 2d 251, 262 (S.D.N.Y. 2010).  On that point, Defendant has submitted the docket in the underlying case, which reveals that there are outstanding cross-motions for summary judgment as to liability in the Underlying Action.  (*See* Donnelly Decl., Ex. 5).[12]  In such a posture, the

---

[11]   The Court is not implying that the duty to defend and the ripeness of the duty to indemnify are coextensive; indeed, they are determined by separate inquiries.  For the duty to defend, a court looks to the reasonable possibility that coverage will be entered, and for the ripeness of the duty to indemnify, whether there is a practical likelihood the third party will prevail in the underlying action.  *Admiral Ins. Co.*, 57 F.4th at 93.  However, in this instance, the Court finds that the same factual circumstances that established the reasonable possibility of coverage also establish the practical likelihood that liability will be found as to Atlas in the underlying litigation.

[12]   The exhibit hyperlinks to documents entered on the docket in the Underlying Action, including Defendants/Third-Party Plaintiffs' Memorandum of Law in Opposition to the Third-Party Defendant Atlas-Acon Electric Service Corp.'s Motion for Summary Judgment, which clearly involves a summary judgment motion as to Atlas's liability.

parties have a legitimate case or controversy as to indemnity because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co.* v. *Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). As such, Article III's case or controversy requirement is satisfied, and the Court has constitutional authority to adjudicate the question of indemnity.

The cases that Defendant cites for the proposition that there is no subject matter jurisdiction are inapposite. The first, *Charter Oak Fire Insurance Co.* v. *Bolding*, is distinguishable because in that case there was no underlying action filed, and so there was no immediate possibility that liability could be triggered. No. 08 Civ. 2632 (KAM), 2009 WL 3246116, at *4 (E.D.N.Y. Oct. 1, 2009). Likewise, in *Atlantic Casualty Insurance Co.* v. *Value Waterproofing, Inc.*, indemnity was ripe for adjudication on the record before the court because the factual record was sufficient to support a decision, despite the fact that the underlying litigation was still pending. 918 F. Supp. 2d at 261-62. Therefore, precedent does not support Defendant's position, and this Court finds that subject matter jurisdiction exists.

That this Court has subject matter jurisdiction does not mean, however, that it is necessarily prudent to exercise it. Although the DJA grants subject matter jurisdiction over actions such as the instant case, "[a] court retains discretion … to refuse to exercise jurisdiction over a declaratory judgment action that it would otherwise be empowered to hear." *Liberty Ins. Corp.*, 2023

43

WL 2597053, at *8 (internal quotation marks and citation omitted).  The

Second Circuit recently articulated six non-exhaustive factors that inform

whether such an exercise of discretion is appropriate.  *Admiral Ins. Co.*, 57

F.4th at 99-100.  They are:

> [i] whether the declaratory judgment sought will serve a
> useful purpose in clarifying or settling the legal issues
> involved; [ii] whether such a judgment would finalize the
> controversy and offer relief from uncertainty;
> [iii] whether the proposed remedy is being used merely
> for procedural fencing or a race to res judicata;
> [iv] whether the use of a declaratory judgment would
> increase friction between sovereign legal systems or
> improperly encroach on the domain of a state or foreign
> court; [v] whether there is a better or more effective
> remedy; and [vi] whether concerns for judicial efficiency
> and judicial economy favor declining to exercise
> jurisdiction[.]

*Id.* (internal citations, quotation marks, and alterations omitted).

Applying those factors and related considerations here, it is clear that a

declaration on the duty to indemnify is inappropriate at this time.  The

Underlying Action is still pending — indeed, summary judgment motions may

be decided imminently — and so there is a risk of inconsistent judgments.

Further, a declaration would in no way finalize the controversy or settle the

underlying legal issues, as liability would still need to be resolved in the

Underlying Action.  Similarly, ruling on indemnity would encroach on the state

court's jurisdiction to determine liability for the state law claims underlying

action and potentially create *res judicata* issues.  Declining to rule on

indemnity in this posture also comports with Circuit precedent predating

*Admiral Insurance.  See Lafarge Canada Inc.*, 2018 WL 1634135, at *5

("[C]ourts regularly require the existence of liability before exercising DJA discretion over indemnity issues.") (collecting cases).

This Court can, consistent with the Constitution, decide the indemnity issue, but doing so would raise a host of practical and comity concerns. Therefore, the Court denies Defendant's motion as to the duty to indemnify without prejudice as to its renewal after liability has been established in the Underlying Action or after other developments occur that would alleviate the Court's expressed concerns.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is GRANTED as to the declaration that Defendant has a duty to defend the Tort Defendants in the Underlying Action and DENIED as to priority of coverage, and Defendant's cross-motion for summary judgment is DENIED. The parties are ORDERED to file a joint status letter on or before **August 22, 2023**, proposing next steps in this action.

The Clerk of Court is directed to terminate the motions at docket entries 18 and 24.

SO ORDERED.

Dated:      August 1, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge